

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00193-CR
_____

JUAN ALVAREZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Criminal Court No. 8
Tarrant County, Texas
Trial Court No. 1522931

Before Gabriel, Kerr, and Birdwell, JJ.
Opinion by Justice Birdwell

**OPINION**

Juan Alvarez challenges the trial court's admission of evidence and imposition of two types of statutory conviction fees in this appeal from his second misdemeanor driving while intoxicated (DWI) conviction.[1] *See* Tex. Penal Code Ann. §§ 49.04(a), 49.09(a). We affirm.

**Brief Background**

Appellant does not challenge the sufficiency of the evidence supporting his conviction. The evidence shows that Officer John Mitchell with the Fort Worth Police Department stopped appellant about 2:00 a.m. after seeing appellant driving his car on Mark IV Parkway with no headlights or taillights on. Appellant had bloodshot and watery eyes, and Officer Mitchell could smell alcohol "coming from [appellant's] person or the vehicle." When Officer Mitchell asked appellant if he had drunk any alcohol, appellant responded that he had drunk two drinks at Buck's, a nearby bar. Officer Mitchell performed standard field sobriety tests; appellant demonstrated six of six possible intoxication clues on the nystagmus test, six of eight possible clues for the

---

[1]Appellant did not complain at trial, nor does he complain on appeal, that the State violated article 36.01 of the code of criminal procedure by reading the prior-conviction enhancement allegation to the jury during guilt-innocence, nor did he object to the admission of evidence of the prior conviction during guilt-innocence. *See* Tex. Code Crim. Proc. Ann. art. 36.01(a)(1); Tex. R. App. P. 33.1(a)(1); *Cox v. State*, 422 S.W.2d 929, 930 (Tex. Crim. App. 1968) (requiring preservation of article 36.01 complaint); *see also Oliva v. State*, 548 S.W.3d 518, 528–29, 534 (Tex. Crim. App. 2018) (holding that prior misdemeanor DWI conviction allegation used to enhance second DWI to a class A misdemeanor is a punishment issue, not a jurisdictional allegation, and therefore the State must read this allegation at punishment instead of guilt-innocence).

walk-and-turn test, and one of two clues on the one-leg stand test. Accordingly, Officer Mitchell arrested appellant, read him the statutory DIC-24 warning[2]—pursuant to which appellant agreed to give a breath sample—and drove him to the downtown Fort Worth jail, where appellant gave a breath sample. The two tested samples showed a blood-alcohol concentration of 0.161 and 0.150. A jury found appellant guilty of driving while intoxicated, and the trial judge assessed his punishment at 80 days' confinement and a $1,250 fine.

### Breath-Test Results Admissible

In his first point, appellant contends that the trial court erred by admitting the results of his breath test because the State failed to prove that the intoxilyzer operator observed appellant for at least fifteen minutes before beginning the test; therefore, the trial court should have excluded the results as both unreliable and illegally obtained. *See* Tex. Code Crim. Proc. Ann. art. 38.23.

A person taking a breath specimen on the request or order of a peace officer must be properly certified and must take and analyze the test "under rules of the department" of public safety (DPS). Tex. Transp. Code Ann. §§ 724.001(7), 724.016(a). The court of criminal appeals has held that compliance with this statute, and therefore DPS's rules, controls whether breath-test results are admissible in a DWI prosecution. *Atkinson v. State*, 923 S.W.2d 21, 23 (Tex. Crim. App. 1996),

---

[2]*See* Tex. Transp. Code Ann. § 724.015.

3

*overruled in part on other grounds by Motilla v. State*, 78 S.W.3d 352, 356–58 (Tex. Crim. App. 2002). One of DPS's testing regulations requires a breath-test operator to "remain in the continuous presence of the [tested person] at least 15 minutes immediately before the test and [to] exercise reasonable care to ensure that the subject does not place any substances in the mouth." 37 Tex. Admin. Code § 19.3(a)(1) (2015) (Tex. Dep't Pub. Safety, Techniques and Methods). But "[d]irect observation is not necessary to ensure the accuracy of the test result." *Id.*

The trial judge must exclude evidence obtained in violation of the law—including breath-test evidence that was obtained absent compliance with DPS's regulations—from the jury's consideration when the defendant so requests. Tex. Code Crim. Proc. Ann. art. 38.23; *Atkinson*, 923 S.W.2d at 23. When the evidence is inadmissible as a matter of law, the judge should not admit the evidence for the jury's consideration, but when disputed fact issues exist, the question of whether the evidence should be excluded may be tried to the jury. *Atkinson*, 923 S.W.2d at 23. Appellant did not request an article 38.23 instruction, nor does he complain that the trial judge erroneously failed to give the jury such an instruction. *See Shpikula v. State*, 68 S.W.3d 212, 223 & n.10 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd).

The State offered its exhibit 6, the "test record analytical report" from the breathalyzer, through Sara Skiles, a senior toxicologist for the Tarrant County Medical Examiner's office. Although the exhibit itself noted, "Fifteen minute waiting period completed – YES," Skiles did not have personal knowledge of the observation

4

because she did not perform the test. The operator listed on exhibit 6 is Christian Paschal-Hamilton, who also testified at trial. After Skiles agreed on voir dire questioning that a breathalyzer test is not valid unless the fifteen-minute observation period occurred, appellant objected to admission of the breath-test results "on the basis of insufficient proof of observation."[3]

Officer Mitchell testified that according to his police report, he arrived at the jail with appellant at 2:48 a.m. The first time recorded on the intoxilyzer was 3:09 a.m.—the "operational system check." The machine recorded appellant's first test result at 3:11 CST and his second at 3:14 CST. Thus, assuming Officer Mitchell and the machine were keeping the same time, at least twenty-one minutes elapsed from the time appellant arrived at the jail to the time the machine began recording.

Officer Mitchell testified that when he arrives at the jail with an arrestee, he turns the person "over to the booking officers or the . . . jailers. They handle it from there. And then from them, he's turned over to the intoxilyzer." Officer Mitchell could not recall the time appellant was turned over to the breath-test operator.

Paschal-Hamilton, the breath-test operator, could not recall appellant's specific test because he performs so many. And appellant's test was not recorded on video because the testing room does not have a camera system. But Paschal-Hamilton

---

[3]Although we do not believe appellant's objection preserved a reliability complaint about the technique used to take his breath test, the result of our analysis would be the same for that complaint. *See* Tex. R. App. P. 33.1(a)(1); *State v. Esparza*, 413 S.W.3d 81, 87 n.25 (Tex. Crim. App. 2013).

remained adamant throughout his testimony that he had waited the requisite fifteen minutes because that is his routine and a "mandatory requirement" of his job. When the prosecutor asked Paschal-Hamilton if he had been in appellant's presence for "at least . . . 15 minutes continuous" before performing the test, he answered, "I always do a 15 minute observation." Paschal-Hamilton further testified that he does "all of [his] transactions the same way" and that he has "very clear instructions to do this. I do it every single time the same way, 15-minute observation, no errors, every time."

Paschal-Hamilton also described the testing process for the jury:

> . . . [A] person will be generally brought to me, and the arresting officer will generally say I have read the specified document, DIC-24, or I have not. If they have not, we'll do that at that time. If they have, I'll begin a 15-minute waiting period. Once we're verified that, yes, the document has been read and then approval for the breath test has -- has started. 15-minute observation period. We check for -- to make sure that they don't have any gum, tobacco, anything in their mouth, foreign object of any kind.
>
> During that period I'll give an instruction phase. Show them the instrumentation, show them the mouth pieces that we use. It's a clear plastic. Give clear instructions.

The machine would ask whether the fifteen-minute observation period occurred, and Paschal-Hamilton would have to click on the yes option. After that, the machine begins the start-up process, which involves drawing air through the mouthpiece to ensure that there is no interference with foreign substances inside the machine. After that, the machine will prompt the operator to have the test subject exhale into the mouthpiece.

6

According to Paschal-Hamilton, the booking desk is "[a]pproximately 25 paces" from the testing device, and booking takes "six to seven minutes, maybe. Perhaps." The booking officer does not bring the test subject to him; either the arresting officer does, or Paschal-Hamilton goes to meet the arresting officer. When asked if he knew when the "waiting period" starts, Paschal-Hamilton answered, "[o]nce I verify things and I'm in their presence." He uses the timer on his own wristwatch to calculate the fifteen minutes, but he does not record the time.

Paschal-Hamilton agreed that the time on his wristwatch could have differed from both the time Officer Mitchell used to record his arrival at the jail with appellant and the time on the intoxilyzer. He also agreed that the purpose of the observation is for the test subject's benefit, to ensure that he does not burp, ingest any other substances, or do anything that could cause the breath-test results to be "artificially high."

Appellant argues that the evidence shows it would have been impossible for Paschal-Hamilton to have waited the required fifteen minutes because appellant arrived in the jail's sally port at 2:48 a.m., stayed in booking for at least six to seven minutes, walked into the intoxilyzer room, and was tested beginning at 3:09 a.m.[4] But appellant's argument assumes Officer Mitchell recorded as the jail arrival time the time he pulled into the sally port, not the time he arrived inside the jail; rigidly applies

[4]The State argues that the test did not actually begin until 3:11, but Paschal-Hamilton testified that the machine does not begin its start-up process until after he verifies that he has completed the required observation.

Paschal-Hamilton's general estimation that booking usually takes six to seven minutes, "[p]erhaps"; fails to take into account that the timing devices might not have been synchronized; and fails to consider Paschal-Hamilton's testimony that he sometimes meets the arresting officer at the front of the jail when the arrestee is brought in. Contrary to appellant's assertion, the evidence does not show that it was impossible for Paschal-Hamilton to have observed appellant for fifteen minutes before the test; thus, the trial judge did not abuse his discretion by admitting exhibit 6. *See Patel v. State*, No. 01-14-00575-CR, 2015 WL 5821439, at *2–3 (Tex. App.—Houston [1st Dist.] Sept. 29, 2015, pet. ref'd) (mem. op., not designated for publication); *Serrano v. State*, 464 S.W.3d 1, 6 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *see also, e.g., Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006) (reiterating that we review a trial court's decision to admit evidence for an abuse of discretion).

We overrule appellant's first point.

**Constitutional Challenges to Statutory Conviction Fees**

In his second and third points, appellant challenges the constitutionality of the conviction fees charged pursuant to articles 102.004(a) and 102.008(a) of the code of criminal procedure, claiming that they violate the separation of powers clause of the Texas constitution because they are not expended for criminal justice purposes and therefore constitute an unconstitutional tax. Tex. Const. art II, § 1; Tex. Code Crim. Proc. Ann. arts. 102.004(a), 102.008(a); *see Salinas v. State*, 523 S.W.3d 103, 107 (Tex. Crim. App. 2017) (explaining that statutes that turn courts into tax gatherers violate

8

article II, section 1's separation of powers clause by delegating to the courts a power more properly attached to the executive branch).

**Article 102.008(a)**

This court has already rejected appellant's constitutional challenge to article 102.008(a). *Tyler v. State*, 563 S.W.3d 493, 503 (Tex. App.—Fort Worth 2018, no pet.). Accordingly, we overrule his third point.

**Article 102.004(a)**

Likewise, the Fourteenth Court of Appeals in Houston has recently rejected the argument that section 102.004(a) is an unconstitutional tax collected by the judiciary rather than a legitimate court cost. *Johnson v. State*, 562 S.W.3d 168, 174, 180 (Tex. App.—Houston [14th Dist.] 2018, pet. filed) (op. on reh'g). As we explain below, we agree with that court's reasoning and adopt it as our own.

Appellant raises a facial challenge to article 102.004(a), which means he must show—despite the presumption of the statute's validity—that no set of circumstances exists under which the statute would be valid. *Peraza v. State*, 467 S.W.3d 508, 514 (Tex. Crim. App. 2015). The court may only consider applications of the statute that the statute actually authorizes or prohibits, not how or where the collected fees might actually be spent. *Id.* at 515. A challenged conviction-fee statute does not violate the separation of powers clause, and is thus constitutional, if it or an interconnected statute provides for an allocation of the charged cost "to be expended for legitimate criminal justice purposes." *Id.* at 517. A criminal justice purpose is one that relates to

9

the administration of our criminal justice system. *Id.* at 517–18. Whether a statute imposes a court cost for a legitimate criminal justice purpose is determined on a case-by-case basis. *Id.* at 518.

Article 102.004(a) requires a defendant convicted by a jury in municipal or justice court to pay a $3 jury fee and a defendant convicted by a jury in a county court, county court at law, or district court to pay a $40 jury fee. Tex. Code Crim. Proc. Ann. art. 102.004(a). But the statute does not allocate the fee to any specific fund, and it does not direct that the collected fees be spent a certain way. *See id.*; *Johnson*, 562 S.W.3d at 178. According to appellant, this lack of specificity is fatal because the fee must then be deposited in the county's general fund, which may be used for any legal purpose.

But local government code section 113.004, an interconnected statute, requires a county treasurer to divide any funds it receives into three classes: (1) "jury fees, money received from the sale of estrays, and occupation taxes; (2) money received under the provisions of a road and bridge law . . . ; and (3) other money received by the treasurer's office that is not otherwise appropriated by this section or by the commissioners court." Tex. Loc. Gov't Code Ann. § 113.004(a), (b). That section also restricts the use of funds from class (1), providing that "amounts that belong to the first class of funds may not be transferred from the payment of claims registered in that class unless there is an excess amount in that class." *Id.* § 113.004(d); *see* Tex. Gov't Code Ann. § 61.001(b) (requiring county juror reimbursement to be "paid out

10

of the jury fund of the county"). In other words, "[t]his directive means that the $40 fee collected from defendants convicted by a jury in district court under article 102.004(a) must be deposited in the first fund under section 113.004(b)(1); in turn, the monies in the first fund may be spent only on expenses relating to the first fund, which expressly includes juries." *Johnson*, 562 S.W.3d at 179. We agree with the Fourteenth Court's conclusion that "[t]hese expenses would include those pertaining to criminal juries, which is unquestionably related 'to the administration of our criminal justice system' and, therefore, a legitimate criminal justice purpose." *Id.* (quoting *Peraza*, 467 S.W.3d at 518). Because local government code section 113.004 provides for the jury fees collected under article 102.004 to be used "for some legitimate criminal justice purposes," appellant has not met his burden to show that article 102.004 cannot be used for a legitimate criminal justice purpose in all circumstances. *Id.* We therefore hold that article 102.004(a) is not facially unconstitutional, and we overrule appellant's second point.

## Conclusion

Because we have overruled all of appellant's points, we affirm the trial court's judgment.

/s/ Wade Birdwell
Wade Birdwell
Justice

Publish

Delivered: February 28, 2019

11